Robert Kenneth **DEWEY**, Plaintiff-Appellee,

v.

**REYNOLDS METALS COMPANY**, Defendant-Appellant.

No. 19746.

United States Court of Appeals, Sixth Circuit.

June 4, 1970.

Order July 30, 1970.

Rehearing Denied Aug. 11, 1970.

William A. Coughlin, Jr., Detroit, Mich., for defendant-appellant; Cross, Wrock, Miller & Vieson, Detroit, Mich., on the brief; Fred R. Edney, Asst. Gen. Counsel, Reynolds Metals Co., Richmond, Va., of counsel.

Donald F. Oosterhouse, Grand Rapids, Mich., for plaintiff-appellee; Vander Veen, Freihofer & Cook, Peter R. Tolley, Grand Rapids, Mich., on the brief.

George H. Darden, Washington, D. C., for Equal Employment Opportunity Commission, amicus curiae; Russell Specter, Acting Gen. Counsel, Equal Employment Opportunity Comm., Washington, D. C., on the brief.

Lawrence Halpern, Detroit, Mich., on brief for National Jewish Commission on Law and Public Affairs, amicus curiae; Howard I. Rhine, of counsel.

Before WEICK and COMBS, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

WEICK, Circuit Judge.

The action in the District Court was brought under the provisions of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e.

Plaintiff's (Dewey's) claim was that he was wrongfully discharged by his employer, the defendant, Reynolds Metals Company (Reynolds), because of his religious beliefs, and he prayed for reinstatement with back pay.

Prior to bringing the action, Dewey filed grievances with Reynolds on the identical claim set forth in his complaint, under the provisions of a collective bargaining agreement entered into by Reynolds with Local 277, United Automobile Aerospace and Agricultural Workers of America, AFL-CIO (UAW), which was the bargaining representative of Reynolds' employees. Dewey was a member of UAW. The grievances were processed and resulted in their submission to a mutually agreeable arbitrator, who made an award denying them on June 29, 1967.

Contemporaneously with the submission of the grievances, Dewey made application to the Michigan Civil Rights Commission for issuance of a complaint against Reynolds, alleging discrimination on account of his religious beliefs.

The following is a Summary of Findings and Order of Dismissal, entered by the Commission on December 13, 1966:

"The findings indicate that the claimant, despite due notice of overtime requirements by the company and the applicable Collective Bargaining Agreement provisions, continued to refuse to perform scheduled overtime work on Sundays and took the position that his right to continued employment while following his religious belief without interference was an absolute right.

"The Commission has previously ruled that where the normal work week and foreseeable overtime requirements are prescribed in a Collective Bargaining Agreement, that absent or (sic) intent on the part of respondent to discriminate on religious grounds, an employee is not entitled to demand any alteration in such requirement to accommodate his religious beliefs.

"The investigation did not reveal any intent on the part of the respondent to discriminate on religious grounds and it is, therefore, recommended that this application for the issuance of a complaint be denied for lack of probable cause.

ORDER OF DISMISSAL

"The Commission has found insufficient grounds on which to issue a Complaint and, therefore, the above Application is herewith denied. This Order of Dismissal shall automatically become effective within 15 days from the date of mailing unless the Claimant shall demand a hearing prior thereto." (App. 93a–94a)

Dewey requested the United States Office of Federal Contract Compliance to review his charges of religious discrimination, and that office found no basis for a charge of discrimination.

On January 4, 1967, Dewey filed a charge with Equal Employment Opportunity Commission (EEOC), claiming religious discrimination. The Commission, on January 5, 1967, contrary to the recommendation of its Regional Director that the Commission find no probable cause, determined that there was reasonable cause to believe that Reynolds had engaged in unlawful employment practices and authorized the bringing of the present action in the District Court. Reynolds moved for dismissal of the complaint filed in the District Court on the grounds that the arbitrator's award was a final adjudication of the grievances and that they could not be relitigated. The District Judge, in a memorandum opinion, denied the motion to dismiss. 291 F.Supp. 786 (W.D.Mich.1968).

Reynolds then answered, denying it discriminated against Dewey on account of his religion and pleaded provisions of the collective bargaining agreement which required employees to perform all straight time and overtime work required of them by the company. Reynolds fur-

**328**

ther alleged that Dewey refused to perform overtime work on Sundays or to arrange for another qualified employee to replace him, basing his refusal on his religious convictions. Reynolds, after giving warnings and a three-days' layoff, finally discharged Dewey under its plant rules for his continued refusal to comply with the provisions of the collective bargaining agreement.

The parties stipulated the facts and the case was tried by the Court without a jury. In a memorandum opinion, the District Judge ruled in favor of Dewey. He ordered Reynolds to reinstate Dewey with back pay and enjoined Reynolds from requiring Dewey to work on Sundays. 300 F.Supp. 709 (W.D.Mich.1969). The District Court refused to stay execution on the reinstatement pending appeal, and required Reynolds to post a $15,000-bond to stay execution on the judgment of $7,286.92 for back pay. 304 F.Supp. 1116 (W.D.Mich.1969). Reynolds appealed. We reverse.

The applicable statute is 42 U.S.C. § 2000e–2(a), which provides as follows:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; * * *."

■ The legislative history of the statute is clear that it was aimed only at discriminating practices. Congressional Record, Vol. 110, pages 13079–13080, June 9, 1964.

■ In order to prove a violation of the Act it was incumbent on Dewey to establish by a preponderance of the evidence that his employer discriminated against him on account of his religion. In 1964 U.S. Code Cong. & Adm. News, page 2515, it is stated:

"A substantial number of committee members, however, preferred that the ultimate determination of discrimina-

tion rest with the Federal judiciary. * * * In addition, we believe that the employer or labor union will have a fairer forum to establish innocence since a trial de novo is required in district court proceedings together with the necessity of the Commission proving discrimination by a preponderance of the evidence."

On page 2516 it is stated:

"Similarly, management prerogatives, and union freedoms are to be left undisturbed to the greatest extent possible. Internal affairs of employers and labor organizations must not be interfered with except to the limited extent that correction is required in discrimination practices."

Reference to the collective bargaining agreement indicates rather clearly that the provisions with respect to straight time and overtime work apply to all employees equally and do not discriminate against Dewey or any other employee.

Reynolds operated a "job type" plant, producing, on order, aluminum extrusions and billets. It was necessary therefore for production to be scheduled to meet delivery dates provided for in contracts with customers.

Prior to the 1960 collective bargaining agreement, overtime was performed by employees on a voluntary basis. As a result thereof, with an increase in orders it became impossible to schedule production on Saturdays and Sundays. In order to remedy this difficulty, Reynolds negotiated with UAW the 1960 and 1965 collective bargaining agreements which provided that the company had the right to set straight time and overtime schedules and the employees were obligated to work such schedules unless they had a substantial and justifiable reason for not doing so. The 1965 agreement provided:

"All employees shall be obligated to perform all straight time and overtime work required of them by the Company except when an employee has a substantial and justifiable reason for not working; provided, however, that no employee shall be required to work

more than twelve (12) continuous hours without his consent."

The agreement provided time and one-half for work on Saturdays and double time for work on Sundays.

The agreement further provided that overtime work shall be divided as equally as possible. If more employees are needed they are assigned in the inverse order of their seniority. Reynolds also issued an interpretation that any employee assigned to overtime could be relieved from the assignment simply by arranging for another qualified employee to replace him. This system was used extensively.

Dewey had been employed by Reynolds in various capacities since 1951, and at the time of his discharge, on September 12, 1966, was a die repairman. Since 1961 Dewey has been a member of Faith Reformed Church. He never volunteered for overtime work on Sunday after joining the church, although he did volunteer for other days.

Dewey was scheduled to work on Sunday, November 21, 1965. He refused to work because of his religious beliefs. He was given a warning and informed as to the necessity of a seven-day operation and was advised that a repetition would lead to disciplinary action under Plant Rule 11, which prohibits "absence from work without reasonable cause," and provides a three-offense progression of punishment with discharge for the third offense.

Between January and August, 1966, Dewey was scheduled to work on five Sundays. He obtained replacements as provided in the contract. On August 28, 1966, he was scheduled again to work on Sunday, and he not only refused to work but also refused to obtain a replacement on the ground of his religious beliefs. The arbitrator found:

"(Dewey, it will be recalled, accelerated his disciplinary timetable by telling Zagman [a fellow employee] not to serve as a replacement any more.)"

On September 4, 1966, Dewey refused to work or to obtain a replacement. He was given a written warning and a disci-plinary layoff of three days. Again he refused to work or to obtain a replacement on September 11 1966, and was discharged for violation of Plant Rule 11.

■ We find nothing discriminatory in the provisions of the collective bargaining agreement or in the manner in which Reynolds executed it. In our opinion, it provided a fair and equitable method of distributing the heavy workload among the employees without discrimination against any of them.

The District Judge found that the compulsory overtime provision of the collective bargaining agreement "is not discriminatory on its face." We agree. However, he said this is only the first step. He found it was discriminatory in its impact. We disagree. He relied on Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); but this case involved state, and not private action.

In reaching his decision that the collective bargaining agreement discriminated against Dewey, the District Judge applied retroactively Regulation 1605.1, adopted by EEOC effective July 10, 1967, which was nearly ten months after Dewey had been discharged and after the arbitrator and the Michigan Civil Rights Commission had rejected Dewey's charges.

■ In our opinion, it would have been more appropriate for the District Court to have applied the EEOC Regulation 1605.1 which was in force at the time of Dewey's discharge, and which became effective June 15, 1966.

The 1966 regulation contained the following provisions which restricted any obligation upon the part of the employer to accommodate to the reasonable religious needs of his employees:

Section 1605.1(a):

"(3) However, the Commission believes that an employer is free under Title VII to establish a normal work week (including paid holidays) generally applicable to all employees, notwithstanding that this schedule may

not operate with uniformity in its effect upon the religious observances of his employees. For example, an employer who is closed for business on Sunday does not discriminate merely because he requires that all his employees be available for work on Saturday."

Section 1605.1(b):

"(3) The employer may prescribe the normal work week and foreseeable overtime requirements, and, absent an intent on the part of the employer to discriminate on religious grounds, a job applicant or employee who accepted the job knowing or having reason to believe that such requirements would conflict with his religious obligations is not entitled to demand any alterations in such requirements to accommodate his religious needs."

The 1967 regulation, retroactively applied by the District Court, omitted the above quoted language and other material parts of the 1966 regulation, and instead of providing definite guidelines for the assistance of employers who might be affected, left the matter largely on an *ad hoc* basis for the decision of the Commission on the particular facts of each case.

■ It is clear that Reynolds complied with the 1966 regulation. The obligations contained in the collective bargaining contract, which were lawful under the regulations of EEOC then in effect, ought not to be impaired by the application of a subsequently passed inconsistent regulation.

■ The District Judge took into account his *ex post facto* application of the 1967 EEOC regulation by starting Dewey's back pay from August 1, 1967, instead of from the date of his discharge, holding that this date was a reasonable time after the 1967 regulation became effective for the company to work out accommodation to it. The trouble with this treatment is that Dewey was no longer in the employ of Reynolds. Having a lawful right at the time to discharge Dewey under the 1966 regulations, Reyn-

olds ought not to be required to reemploy him at a later date and pay his back salary merely because EEOC decided to change the rule by adopting new, inconsistent regulations. The rights of Dewey and Reynolds were governed by the law in effect at the time of the discharge. EEOC could not affect these rights by subsequently adopting a new regulation.

The Act further provides:

"No order of the court shall require * * * the hiring, reinstatement or promotion of an individual employee, or the payment to him of any back pay, if such individual * * * was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex or national origin or in violation of section 2000e–3(a) of this title." 42 U.S.C. § 2000e–5(g).

■ The reason for Dewey's discharge was not discrimination on account of his religion; it was because he violated the provisions of the collective bargaining agreement entered into by his union with his employer, which provisions were applicable equally to all employees. The violation consisted not only of his refusing to work on Sundays, but also his refusing to arrange for a replacement, which was an alternate procedure. He did arrange for five replacements, but later refused even to do this, claiming that it was a sin. He apparently did not regard it as sinful for him to collect wages from an employer who was compelled to schedule overtime production in order to meet its contractual commitments and eventually meet its payroll.

To accede to Dewey's demands would require Reynolds to discriminate against its other employees by requiring them to work on Sundays in the place of Dewey, thereby relieving Dewey of his contractual obligation. This would constitute unequal administration of the collective bargaining agreement among the employees, and could create chaotic personnel problems and lead to grievances and additional arbitrations. The practice of permitting the employee, rather than

the employer, to secure the replacement served to insulate the employer against any charge of unequal naming of replacements.

■ But even if the 1967 regulations are applied, we think that Reynolds complied with Section 1605.1(b) thereof by making a reasonable accommodation to the religious needs of its employees when it permitted Dewey, by the replacement system, to observe Sunday as his Sabbath.[1] He stubbornly refused to exercise this privilege. The finding of the District Court that Reynolds did not make reasonable accommodations to the religious needs of Dewey is not supported by substantial evidence and is clearly erroneous. Rule 52(a) Fed.R.Civ.P.

The District Court referred to the inalienable right of freedom of religion, which he said is protected by the First and Fourteenth Amendments to the Constitution and the Civil Rights Act. The employer did not question Dewey's right to freedom of religion; Reynolds did question Dewey's right to practice his religious beliefs on it and to interfere with the operation of its plant.

An additional defense is provided in the first sentence of 42 U.S.C. § 2000e–5 (g), which provides:

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice)."

This section of the statute requires a finding that the employer has intentionally engaged in an unlawful employment practice before the court may award relief. Richards v. Griffith Rubber Mills, 300 F.Supp. 338, 341 (D.Ore.1969).

■ It can hardly be said that Reynolds intentionally violated the Act when no discrimination was found by either the Michigan Civil Rights Commission, the Office of Federal Contract Compliance, the arbitrator chosen by agreement of the parties, or the Regional Director of the EEOC in Cleveland. In addition, in order to support his finding of an unlawful employment practice, the District Judge had to apply regulations adopted subsequent to the employee's discharge and ignore those in force at the time the alleged violation took place. The finding of the District Court that there was an intentional violation of the Act is not supported by substantial evidence and is clearly erroneous. Rule 52(a) Fed.R.Civ. P.

*Effect of the Arbitration*

It is clear that if the arbitrator of the grievances had granted an award to Dewey, instead of to Reynolds, the award would have been final, binding and conclusive on Reynolds. Reynolds would not have been permitted to relitigate the award in the courts. This is the teaching of the United Steelworkers trilogy, which clearly defined the respective functions of the courts and the arbitrator. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564 to 602, 80 S.Ct. 1343, to 1347, 4 L.Ed.2d 1403 to 1408, 363 U.S. 574 to 592, 80 S.Ct. 1347 to 1358, 4 L.Ed.2d 1409 to 1423, 363 U.S. 593 to 602, 80 S.Ct. 1358 to 1363, 4 L.Ed.2d 1424 to 1431 (1960); Washington v. Aerojet-General Corp., 282 F.Supp. 517 (C.D.Cal., 1968).

[1]. It should be observed that it is regulation 1605.1(b) and not the statute (§ 2000e–2 (a)) that requires an employer to make reasonable accommodation to the religious needs of its employees. As we have pointed ed out, the gravamen of an offense under the statute is *only* discrimination. The authority of EEOC to adopt a regulation interfering with the internal affairs of an employer, absent discrimination, may well be doubted.

In *Steelworkers*, the Court said:

"When the judiciary undertakes to determine the merits of a grievance under the guise of interpreting the grievance procedure of collective bargaining agreements, it usurps a function which under that regime is entrusted to the arbitration tribunal." (*Id.* at 569, 80 S.Ct. at 1347)

■ The arbitrator had jurisdiction to determine the grievances. The arbitration involved an interpretation of the collective bargaining agreement with respect to Dewey's claims that he had been laid off and discharged because of his religious beliefs. In arbitration proceedings, frequently questions of law and fact are resolved by the arbitrator. Where the grievances are based on an alleged civil rights violation, and the parties consent to arbitration by a mutually agreeable arbitrator, in our judgment the arbitrator has a right to finally determine them. Any other construction would bring about the result present in the instant case, namely, that the employer, but not the employee, is bound by the arbitration.

This result could sound the death knell to arbitration of labor disputes, which has been so usefully employed in their settlement. Employers would not be inclined to agree to arbitration clauses in collective bargaining agreements if they provide only a one-way street, *i. e.*, that the awards are binding on them but not on their employees.

The tremendous increase in civil rights litigation leads one to the belief that the Act will be used more frequently in labor disputes. Such use ought not to destroy the efficacy of arbitration.

In the supplemental brief of EEOC as amicus curiae, the case of Smith v. Evening News Ass'n, 371 U.S. 195, 197–198, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962), is cited for the proposition that "the complainant is not required to elect between his contractual rights or his statutory rights but may seek to vindicate his claim in contractual and statutory proceedings." (EEOC Supp. Brief, p. 3) The writer of the brief neglected to state that the collective bargaining agreement in *Evening News* contained no grievance arbitration procedure which had to be exhausted before recourse could be had to the courts. 371 U.S. 196, fn 1, 83 S.Ct. 267.

■ The question in our case is not whether arbitration and resort to the courts could be maintained at the same time; rather our case involves the question whether suit may be brought in court *after* the grievance has been finally adjudicated by arbitration.

We see no good analogy between jurisdiction of the National Labor Relations Board and that of EEOC. The Labor Board has adjudicatory powers over unfair labor practices, subject only to judicial review. Orders of the Board may be vacated on review only when they are not supported by substantial evidence upon consideration of the record as a whole. EEOC, on the other hand, has no such power. The District Court considers EEOC cases de novo. The legislative history, from which we have previously quoted, indicates the reason for the difference.

Nor do we find any national policy for ousting arbitrators of jurisdiction to finally determine grievances initiated by employees, based on alleged violation of their civil rights.

The judgment of the District Court is reversed and the cause is remanded with instructions to dismiss the complaint.

COMBS, Circuit Judge (dissenting).

I respectfully dissent. In my opinion the District Court correctly concluded that the company had not complied with Title VII of the Civil Rights Act in that it failed to make reasonable accommodation to Dewey's religious beliefs.

The Equal Employment Opportunity Commission was formed to further the purposes of the Act, 42 U.S.C. § 2000e–4, and was granted power to promulgate regulations consistent with the provisions of the Act. 42 U.S.C. § 2000e–12 (a). The Commission's interpretation

of the Act is persuasive although not binding on this Court. It was said in Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965): "[T]his Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration," citing Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946); Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941); and Universal Battery Co. v. United States, 281 U.S. 580, 50 S.Ct. 422, 74 L.Ed. 1051 (1930).

Pursuant to its statutory authority, the Commission issued Regulation Section 1605.1, effective July 10, 1967, which provides, inter alia:

"(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a) (1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. * * *

(c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable."

As the majority opinion correctly points out, the 1967 Regulations were not in effect at the time of Dewey's discharge. However, the 1966 Regulations, which were in effect at that time, also provided that "the duty not to discriminate on religious grounds includes an obligation on the part of the employer to accommodate the reasonable religious needs of employees and, in some cases, prospective employees where such accommodations can be made without serious inconvenience to the conduct of

the business." It is thus apparent that the cornerstone of both the 1966 and 1967 Regulations is the obligation of the employer to accommodate the religious needs of employees where such accommodations can be made without undue hardship on the conduct of the employer's business.

This is a reasonable interpretation of the Act. So, the test is whether the company has made reasonable effort to accommodate Dewey's religious beliefs. The only accommodation to which the company points, in addition to requesting volunteers, is the privilege extended to Dewey to obtain replacement for his Sunday overtime assignments. The majority views the existence of this privilege as a reasonable accommodation to Dewey's religious needs, and notes that "he stubbornly refused to exercise this privilege." This "stubborn" refusal on Dewey's part was grounded in his belief that working on Sunday is inherently wrong and that it would be a sin for him to induce another to work in his place. The replacement system was therefore no solution to Dewey's problem. There is a significant failure by the company to show that it could not have obtained a replacement for Dewey without hardship or inconvenience. There is also no showing that Dewey's failure to work himself or to obtain a replacement would have seriously disrupted work schedules or internal discipline. I find no support in the record for the assertion in the majority opinion that to grant Dewey's request would cause "chaotic personnel problems and lead to grievances and additional arbitrations." I think the company has completely failed to show that Dewey's refusal to work on Sunday would create undue hardship on the conduct of its business.

Nor am I impressed with the argument that to grant Dewey's request would necessarily affect the company's contractual right to require overtime work. No evidence was adduced on this point. The company may not stand flatfootedly on its contractual right to require overtime work. Provisions of the

**334**

contract must give way to constitutional mandates and valid statutory enactments. The First Amendment right to freedom of religion has always been recognized as one of the Bill of Rights' strongest mandates. Even though this right has not been extended into the field of labor relations, section 703(a) (1) of the Civil Right Act is a Congressional directive that reasonable accommodation should be made by management to the religious beliefs of employees when this can be done without undue hardship on the employer. The District Judge did not apply the First and Fourteenth Amendments to the bargaining agreement here involved, but placed his reliance on Title VII of the Act and specifically stated that he did not find it necessary to reach the question whether plaintiff's constitutional rights had been violated.

Lastly, I am unable to agree that Dewey made an election of remedies by first pursuing the grievance procedure under the bargaining agreement and that he is thereby precluded from maintaining this action. Dewey's rights under the collective bargaining agreement and those created by Title VII of the Act are separate and distinct. The election of remedies doctrine therefore does not apply. See Bowe v. Colgate Palmolive Company, 416 F.2d 711 (7th Cir. 1969); Bankers Trust Co. v. Pacific Employers Ins. Co., 282 F.2d 106, 110 (9th Cir. 1960). The Seventh Circuit held in *Bowe* that a plaintiff suing under 42 U.S.C. § 2000e could "utilize dual or parallel prosecution both in court and through arbitration so long as election of remedy was made after adjudication so as to preclude duplicate relief which would result in an unjust enrichment or windfall to the plaintiffs."

I would affirm the judgment.

A majority of the Judges of this Court having voted against a rehearing en banc, it is ORDERED that the petition for rehearing be referred to the panel for final disposition. Judges Edwards and McCree voted in favor of a rehearing en banc.

Entered by order of the Court.

Before WEICK and McCREE*, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

WEICK, Circuit Judge.

It is contended that we have adopted a narrow construction of the Civil Rights Act and the Regulations adopted by EEOC thereunder. We submit that we have not. The legislative history of the Act expresses a clear Congressional intent to inhibit only discrimination against an individual because of his race, color, religion, sex or national origin. The plain language of the statute, Section 2000e–2(a) of Title 42, is susceptible of no other meaning.

Nowhere in the legislative history of the Act do we find any Congressional intent to coerce or compel one person to accede to or accommodate the religious beliefs of another. The requirement of accommodation to religious beliefs is contained only in the EEOC Regulations, which in our judgment are not consistent with the Act.

The collective bargaining agreement, by which *all* employees were obligated to perform straight time and overtime required of them by the company, was equally and uniformly applied to all of the employees, and it discriminated against no one.

To construe the Act as authorizing the adoption of Regulations which would coerce or compel an employer to accede to or accomodate the religious beliefs of all of his employees would raise grave constitutional questions of violation of the Establishment Clause of the First Amendment. It is settled that the Government, in its re-

* Judge McCree was designated by the Chief Judge as the third member of the panel, to take the place of Judge Combs who resigned as a member of the Court on June 5, 1970, prior to the filing of the petition for rehearing. The designation was made in order that Judge McCree may file a dissent expressing his views.

lations with religious believers and non-believers, must be neutral. The Government is without power to support, assist, favor or handicap any religion. See Abington School Dist. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); Everson v. Board of Educ., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

In Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1951), the Court upheld a state Sunday Closing Law against the contention that it operated to prohibit the free exercise of appellant's religion which observed Saturday as the Sabbath.

No one disputes Dewey's right to his religious beliefs. The question is whether he has the right to impose his religious beliefs on his employer and interfere with the operation of its plant. As Mr. Justice Douglas pointed out in his concurring opinion in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the religious beliefs of individuals may take on many forms. He mentioned specifically only a few, including Moslems, who attend a mosque on Friday and pray five times daily; Sikh, who carry a symbolic or regular sword; Quakers, who affirm instead of swearing; and Seventh Day Adventists, who observe Saturday as Sabbath and eat only certain meats.

The arbitrator in his award stated that an employee might even join a religious organization which observed Wednesday as Sabbath.

It is argued that under EEOC Regulations the employer is required to make only reasonable accommodations to the religious needs of his employees. The employee may claim that all of his religious needs are reasonable, irrespective of discrimination, and file charges with EEOC against his employer for failure to accomodate them. An employer with thousands of employees could certainly be harassed by the filing of many of such claims. This would also present serious problems for labor organizations to cope with.

Congress did not intend that employers or labor organizations should be harassed with respect to claims not involving discrimination. In the legislative history of the Act it is stated:

"Internal affairs of employers and labor organizations must not be interfered with except to the limited extent that correction is required in discrimination practices." 1964 U.S.Code Cong. & Adm.News, at p. 2516.

 The fundamental error of Dewey and the Amici Curiae is that they equate religious discrimnation with failure to accommodate. We submit these two concepts are entirely different. The employer ought not to be forced to accommodate each of the varying religious beliefs and practices of his employees.

Dewey entered the employ of Reynolds before he acquired his religious beliefs. The 1960 collective bargaining agreement was also entered into prior to that time. After he acquired his religious beliefs, his employer did endeavor to make accommodation to the religious beliefs of its employees by interpreting the agreement so as to permit any employee assigned to overtime to be relieved from the assignment simply by arranging for another qualified employee to replace him. We hold that this was a reasonable accommodation.

Dewey, with no difficulty, did arrange for replacements on five different occasions, and then he decided not only that it was a sin for him to obtain a replacement, but the arbitrator found specifically that Dewey told his replacement, Zagman, "not to serve as a replacement any more."

 While it was stipulated that Dewey was sincere in his beliefs, he offered no proof that the tenets of his church forbade his designating a replacement to serve in his place on Sundays.

The fact that he was sincere in his beliefs gave him no greater rights.

Moreover, the retroactive application of the 1967 Regulations to the 1966 discharge is justified by EEOC in its amicus brief, with the assertion that its Regulations are only "interpretations" and that "the timing of the Commission interpretations is irrelevant" since the 1966 Regulation is now a "defunct Commission guideline." Although defunct in 1967, it was certainly in full force and effect in 1966 and authorized the employer to prescribe

> "the normal work week and foreseeable overtime requirements and absent an intent to discriminate on religious grounds, a job applicant or employee who accepted the job knowing or having reasonable grounds to believe that such requirements would conflict with his religious obligations is not entitled to demand any alterations in such requirements to accommodate his religious needs."

Dewey did not acquire his religious beliefs until after his employer had entered into the 1960 collective bargaining agreement which required all employees to work overtime. Dewey thus had actual knowledge that the requirements of the collective bargaining agreement would conflict with his subsequently acquired religious needs. Under the regulations in force at the time, which EEOC claims are now defunct, the employer was under no obligation to accommodate. There was no claim that the employer intended to discriminate on religious grounds. These regulations had the force and effect of law. Their subsequent repeal, after the discharge, ought not to affect the rights or obligations of either party.

The simple answer, however, to all of Dewey's claims is that the collective bargaining agreement was equal in its application to all employees and was uniformly applied, discriminating against no one.

### Effect of the Arbitrator's Award

The case of Culpepper v. Reynolds Metals Co., 421 F.2d 888 (5th Cir. 1970), is relied on in support of the proposition that an employee may utilize both arbitration and an action under Title VII of the Civil Rights Act. In Culpepper, however, only a grievance was filed, which was never processed through arbitration. *Culpepper* involved racial discrimination, which a majority of the panel thought was so serious as to impose—

> " * * * the duty on the courts to make sure that the Act works. * * "

Circuit Judge Coleman, who filed a concurring opinion, disagreed rather vigorously that any such duty was imposed on the Courts. He stated:

> "Under our Constitutionally ordained form of Government, whether an Act works or fails is the concern of the Executive or Legislature, or both—not the courts."

We do not regard it as our function to enlarge on the plain language of a statute so as to impose on citizens obligations never intended by Congress, in order to make it work.

Great reliance is placed upon Hutchings v. United Industries, Inc., 428 F.2d 303 (5th Cir. 1970), which was decided after our decision in the present case was announced. In our opinion Hutchings does not comport with Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed. 2d 199 (1970).

In *Boys Markets*, Mr. Justice Brennan emphasized the importance of arbitration in the settlement of labor disputes. He said:

> "However, we have frequently noted, in such cases as *Lincoln Mills*, [353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972] the *Steelworkers* [363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403] *Trilogy*, and *Lucas Flour*, [369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593] the importance which Congress has attached generally to the voluntary settlement of labor disputes without resort to self-help and more particularly to arbitration

as a means to this end. Indeed, it has been stated that *Lincoln Mills*, in its exposition of § 301(a), 'went a long way towards making arbitration the central institution in the administration of collective bargaining contracts.'

"The *Sinclair* [370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440] decision, however, seriously undermined the effectiveness of the arbitration technique as a method peacefully to resolve industrial disputes without resort to strikes, lockouts, and similar devices. Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking." [footnote omitted].

Similarly, employers would be wary of arbitration clauses in collective bargaining agreements if, as in the present case, the arbitration is binding on them only and not on their employees.

Our case is even stronger than *Boys Markets* because the grievance here was submitted to arbitration and the arbitrator made an award which was final, binding and conclusive on the parties. It is as binding as a judgment. 5 Am.Jur.2d, Arbitration and Award, § 147. It remains in full force and effect.

The amicus brief of NAACP Legal Defense Fund candidly recognizes that "[i]t may be true that the result of such an accommodation will be that the employer but not the employee will be bound by the decision of the arbitrator." (Brief, p. 14).

We know of no good reason why an award of an arbitrator should not be binding on both parties, the same as a judgment of a court.

It is difficult for us to believe that any employer would ever agree to arbitration of a grievance if he knew that the employee would not be bound by the result.

The importance of arbitration in the resolution of all labor disputes is the theme of the United Steel Workers Trilogy, 363 U.S. 564–602, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). The purpose of arbitration is thwarted if the awards are held by the courts to be binding on employers only and not on employees.

The petition for rehearing is denied.

McCREE, Circuit Judge (dissenting). I would grant the petition for rehearing and affirm the judgment of the District Court for the reasons stated in the dissenting opinion of Judge Combs. Furthermore, I observe that in addition to the Seventh Circuit, Bowe v. Colgate-Palmolive Co., 416 F.2d 711 (1969), the Fifth Circuit has held that appellee's invocation of the grievance-arbitration procedure did not bar him from proceeding in the District Court under Title VII of the Civil Rights Act. Hutchings v. United States Industries, Inc., No. 28750 (5th Cir. June 19, 1970).