709 F.2d 284
 32 Fair Empl.Prac.Cas. 60, 32 Empl. Prac.
Dec. P 33,693
B. Ray FIKE, Appellant,
v.
UNITED METHODIST CHILDREN'S HOME OF VIRGINIA, INC. and
Charterhouse School, Inc., Appellees.
 No. 82-1457.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 7, 1982.
Decided June 16, 1983.
 
 Stephen W. Bricker, Richmond, Va., for appellant.
 H. Aubrey Ford, III, Richmond, Va., Jack B. Russell, Browder, Russell, Morris & Butcher, Richmond, Va., on brief), for appellees.
 Before MURNAGHAN and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 SPROUSE, Circuit Judge:
 
 
 1
 B. Ray Fike appeals from the summary judgment entered against him in favor of the United Methodist Children's Home of Virginia, Inc. (the Home). The district court ruled that the Home did not violate the Title VII[1] prohibition against religious discrimination when it discharged Fike, a Methodist layman, and hired a Methodist minister to replace him; that the first amendment was inapplicable because the State of Virginia's involvement with the Home did not amount to "state action"; and that Fike lacked standing to seek an injunction prohibiting state funds from being received by a separate corporation now operating the Home.[2] We agree and affirm.
 
 
 2
 The parties do not dispute the district court's summary of the relevant facts developed from the materials submitted on cross-motions for summary judgment. When this dispute arose, the Home had operated under the auspices of the United Methodist Church for some 80 years. Fike served as its Director from 1974 to 1978 but, except for those four years, the Home's director had always been a Methodist minister. Although Fike is not a minister, he is and was a member of the Methodist Church since the 1950's. He specifically noted on his application for employment with the Home that his father was a Methodist minister. Fike's status as a Methodist layman apparently was not a major factor in his selection by the Home, but Fike was hired, in part, due to the changing nature of the institution. In earlier years it had operated primarily as an orphans' home--caring for children referred to it by churches or other private sources. The type of children committed to its care later evolved to that described by the district court as "[a] new type of youngster, the older child who had gotten into trouble with the law or was having difficulty at home, was seen as in need of institutional services. That type of child was often referred by various public agencies dealing with youths."[3] The Home's Board of Directors instructed Fike when it hired him in 1974 "to develop contacts with public agencies serving troubled youths--local welfare departments, juvenile courts, the State Department of Corrections--and to solicit referrals."[4]
 
 
 3
 The number of children placed in the Home by the State of Virginia increased during the period Fike was Director. The amount of financial assistance provided by the state increased proportionately. The parties stipulated that in the five-year period from 1976 to 1980, the annual contribution of the state averaged approximately 18% of the Home's operating expenses. The Home was subject to regulations by state placement agencies during that period.
 
 
 4
 The Methodist Church grew discontent with the post-1973 changes in the Home's operation, and in 1978 the Church's governing body recommended that Fike be dismissed and that a Methodist minister be hired as director in order to bring the Home back to the Church structure. Fike was then dismissed in accordance with that recommendation.
 
 
 5
 The district court initially found that the Home was a secular institution not entitled to the sectarian exemption in 42 U.S.C. Sec. 2000e-1.[5] It went on to find, however, that the Home, in discharging Fike, did not discriminate against him on the basis of religion in violation of Title VII. We agree with the latter conclusion, and consequently we find it unnecessary to consider whether the Home is entitled to the sectarian exemption.
 
 
 6
 As enacted in 1964, Title VII simply prohibited employment discrimination on the basis of religion without elaborating on what constituted "religious discrimination."[6] In the 1972 amendment to Title VII, Congress defined the term "religion," focusing primarily on an employer's obligation to "reasonably accommodate" an employee's religious practices.[7] Indeed, virtually all reported cases addressing complaints of employment discrimination based on religion concern whether the employer failed "to reasonably accommodate" the claimant's religious practices.[8] The issue of reasonable accommodation obviously is not a concern in this case. We are confronted with the issue of whether the proscription against religious discrimination extends to the discharge of a Methodist layman and his replacement with a Methodist minister under the circumstances of this case.
 
 
 7
 Both Fike and the minister who replaced him as director of the Home were members of the Methodist Church, which operated the Home. Fike had been a Methodist layman for well over twenty years and noted that association in his application for the job as director. The Church selected a Methodist minister, Gerould Ward, to replace Fike after his dismissal. There is no question that the Church considered the fact that Ward was a minister in choosing him as Fike's replacement. We are not prepared to say that such factor could never give rise to a claim of religious discrimination in violation of Title VII. Under the facts of the immediate case, however, the Home's consideration of Ward's status as a minister as compared to Fike's status as a layman does not present a claim.
 
 
 8
 The Home experimented with program changes beginning in 1973, including retention of Fike who had experience working with the new type of children sheltered by the Home. The governing board of the Methodist Church who sponsored the Home subsequently felt that the experiment was unsuccessful and that one of the remedies required was the retention of a minister trained in the administrative affairs of the Church. The Home, after all, received a majority of its funds from the Church and private endowments, and a minister trained in the ways of the Church and its affiliates and having the confidence of its various functionaries, might well be in a better position to administer the affairs of the Home. It is thus apparent that Ward was not hired for the religious influence he might exert over the children or the Home's employees, but for the administrative advantage of his experience and contacts with the Church. In short, we agree with the district court that in this instance "[t]he difference between their [Ward and Fike] respective status as layman or minister is not a religious difference."[9]
 
 
 9
 We also agree with the district court that Fike did not establish that the state's participation in the affairs of the Home amounted to state action. This is true whether viewed under the "symbiotic" relationship test of Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); the "nexus" test of Moose Lodge 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1973) and Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); or the "public function" test, Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); see also Rendell-Baker v. Kohn, --- U.S. ----, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); Adams v. Bain, 697 F.2d 1213 (4th Cir.1982). Fike's first amendment claim thus must fail.
 
 
 10
 After remand to the district court, Fike amended his complaint to include a second defendant, Charterhouse School, Inc. He alleged that the Home established Charterhouse in 1979[10] as a separate corporation for the sole purpose of creating a conduit for government funds to the Home which it believed it could not otherwise receive. He sought to enjoin receipt by the defendants of government funds contending that this violates the establishment clause of the first amendment. We agree with the district court's dismissal of that claim. See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).
 
 
 11
 The judgment of the district court is affirmed.
 
 
 
 [1]
 Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e et seq
 
 
 [2]
 Fike v. United Methodist Children's Home of Va., Inc., 547 F.Supp. 286 (E.D.Va.1982)
 
 
 [3]
 Id. at 288
 
 
 [4]
 Id
 
 
 [5]
 That section provides:
 This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.
 
 
 [6]
 42 U.S.C. Sec. 2000e-2(a)(1)
 
 
 [7]
 Id. Sec. 2000e(j):
 The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.
 
 
 [8]
 See, e.g., Trans World Air Lines, Inc. v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir.1970), aff'd, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971); Redmond v. GAF Corp., 574 F.2d 897 (7th Cir.1978); Jordan v. North Carolina Nat. Bank, 565 F.2d 72 (4th Cir.1977); Draper v. United States Pipe & Foundry Co., 527 F.2d 515 (6th Cir.1976). See generally Annot., 22 A.L.R.Fed. 580 (1975 & Supp.1982)
 
 
 [9]
 547 F.Supp. at 290-91
 
 
 [10]
 Charterhouse was incorporated after Fike's discharge and there is no allegation that his discharge was in any way connected with the establishment of that corporation